James F. X. O'Brien v. Commissioner.
O'Brien v. Comm'r
Docket No. 3762. United States Tax Court
1945 Tax Ct. Memo LEXIS 293; 4 T.C.M. (CCH) 221; T.C.M. (RIA) 45069; February 15, 1945
*293 James F. X. O'Brien, pro se, and David Zuckerman, C.P.A., for the petitioner. Jonas M. Smith, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in income tax of $22,971.78 and the imposition of a five per cent ad valorm penalty amounting to $1,148.59 for the taxable year 1939. Several questions have been raised by the parties. They are: (1) Whether the income is taxable to petitioner in 1939, (2) whether a part of the proceeds received by petitioner constitutes repayment of a loan or is chargeable as part of his capital gain, (3) whether petitioner was the owner of 175 or 650 shares of stock, (4) whether the sum of $8,333.33 represents income taxable to petitioner, or whether he is taxable only to the extent of the value of certain busses received, and (5) whether the negligence penalty was properly imposed by the respondent. Several items included in the deficiency are not contested by petitioner. Findings of Fact Petitioner is an individual residing at Newark, New Jersey, where he is engaged in the practice of law. His income tax return for the taxable year 1939 was filed with the collector for *294 the fifth collection district of New Jersey at Newark. Jersey Bus Lines, Inc., hereinafter referred to as Jersey Bus, was a New Jersey corporation operating a bus transportation service over intrastate and interstate routes in and around New Jersey. The corporation was organized in 1926. Petitioner became its first president and Charles L. Brady became secretary-treasurer. The petitioner relinquished his official position sometime after 1933 and did not hold an office again until 1937 when he became assistant secretary. Jersey Bus, through petitioner as its president and Charles L. Brady as secretary-treasurer, executed and delivered to the petitioner a promissory note in the amount of $59,587, payable three years and six months after date. The note was dated April 1, 1933, it contained no provision for the payment of interest and it carried a notation stating "Consolidation past due obligations." The amount of the consolidated note was determined in petitioner's law office by petitioner and Charles L. Brady from at least 66 smaller notes then in petitioner's possession and from checks drawn by petitioner upon his personal bank accounts. Of the $59,587 making up the note approximately *295 $13,300 represented loans made to or for the benefit of Jersey Bus by members of petitioner's family other than petitioner himself. Petitioner had guaranteed these advances and had later paid them. On October 1, 1933, a note in the amount of $400, payable to petitioner one month after date, was similarly executed by Jersey Bus through the same officers. None of these debts were reflected upon the books of the company, which books were destroyed by fire in 1938. The total amount loaned, paid for the benefit of, or guaranteed and paid by petitioner from 1926 to October 1, 1933 for Jersey Bus, was $59,987. Petitioner was entitled to repayment of said sum and was not paid until the sale proceeds hereinafter referred to were received. In 1933 negotiations were under way between Jersey Bus, Flying Eagle-Whiteway Lines, Inc., Suburban Bus Line, Inc., and Washington Bridge Express Lines, Inc., through which it was hoped to accomplish a merger of these companies. The merger plans fell through but the four companies, each retaining its own corporate identity, entered into a pooling arrangement for their mutual benefit. They used a common gasoline and oil supply, a common garage and repair *296 shop, and operated over each other's routes. The income from operations was first used to pay expenses and the profits, if any, were then distributed to the various corporations on the basis of the mileage operations of each corporation's busses. Petitioner advanced money to and for the benefit of the various corporations in the pooling arrangement as the necessity arose. Other advances were evidenced by checks which petitioner had drawn upon his bank accounts. The total amount personally advanced by the petitioner from December 1933 to the date of stock transfer in 1939, amounted to $30,648, of which the sum of $28,371.37 was not repaid until the purchase money hereafter referred to was received. In 1937 the petitioner, as an agent for Jersey Bus, obtained options from the holders of the outstanding capital stock of Suburban Bus Line, Inc., Flying Eagle-Whiteway Bus Lines, Inc. and Washington Bridge Express Lines, Inc., hereinafter called the corporations, under which all of the capital stock of those companies could be purchased. The options were thereafter exercised in 1937 and petitioner paid as much money on the option price as was necessary to satisfy the individual seller *297 for the time being. Part of the money used for this purpose was derived from the $45,000 received from the Public Service Co. in 1937, a part of the stock purchase price hereinafter referred to, and the balance was advanced by petitioner personally. The bus routes operated by the corporations were transferred to Jersey Bus with the consent of the Board of Public Utility Commissioners of New Jersey in November 1937. Only intrastate routes were involved in these transfers. The busses owned by the corporations were transferred to Jersey Bus in 1937. It was understood that by receiving these assets Jersey Bus assumed all of the outstanding liabilities of the corporations. Between 1934 and 1939 the petitioner advanced to or for the account of Jersey Bus the sum of $28,371.37. This amount coupled with the $59,987 advanced by him prior to 1934, amounted to $88,358.37 and represented the total amount due petitioner, none of which was repaid until the purchase money hereinafter referred to was received. On May 26, 1937, petitioner, as attorney in fact for all the stockholders of Jersey Bus, entered into a contract with the Public Service Interstate Transportation Company, hereinafter *298 called the Public Service Co., under which petitioner agreed to sell and the Public Service Co. agreed to purchase, all of the issued and outstanding capital stock of Jersey Bus. The purchase price agreed upon was $45,0000, of which 10 per cent, or $45,000, was paid upon execution of the contract. Since Jersey Bus was engaged in both interstate and intrastate transportation service it was necessary that the sale transaction and stock transfer be approved by the Interstate Commerce Commission and the Board of Public Utility Commissioners of New Jersey. The contract provided that when these approvals were received the stock would be transferred and the balance of the purchase price would be paid. It was understood by the parties that the assets of Jersey Bus would include the assets of Flying Eagle-Whiteway Lines, Suburban Line, and Washington Bridge Lines, hereinafter called the corporations. Also, it was understood and provided that the assets, at the time of transfer would be free and clear of all debts except certain obligations which Public Service had specifically agreed to assume. The purchase money was to be first used to pay off all existing debts. By a contract executed May 26, 1937, between *299 petitioner as attorney in fact and the Public Service Co., it was agreed that Public Service would operate Jersey Bus Lines from and after June 15, 1937. Public Service Co. agreed that in taking over the operations it would do nothing to depreciate in any way the rights and properties taken over. The effect given the agreement by the Public Service Co. was to send an accountant to Jersey Bus to act as comptroller and as a conservator of the property. The accountant, who was paid by Jersey Bus, resigned in 1938 and was not replaced. On May 26, 1937, there were 1100 shares of Jersey Bus stock outstanding. Of these, 175 shares were owned by petitioner and were so listed on the stock books of the corporation. Two hundred shares were listed in the name of Winifred L. Davidson, petitioner's sister, 200 shares in the name of J. William Davidson, petitioner's brother-in-law, and 75 shares in the name of Fitzpatrick O'Brien, petitioner's father. The total number of shares owned by the family group was 650. The remaining shares, numbering 450, were owned by and listed in the names of several members of the Wagman family and several members of the Brady family. All of these shares were so owned *300 in 1939, at which time they were transferred and assigned by the various registered owners to the Public Service Co.
By a contract dated May 26, 1937, petitioner, in his individual capacity, agreed to purchase and the Public Service Co. agreed to sell certain busses for $25,000. The busses in question were then owned or later acquired by Jersey Bus Lines and were included in the assets of Jersey at the time the stock was transferred. On April 24, 1939, petitioner, as attorney in fact, drew a check payable to the Public Service Co. for $25,000. The check was indorsed as follows: "Received and accepted in full payment of any and all services rendered and/or work done and/or goods or material sold or supplied to Jersey Bus Lines, Inc., Suburban Bus Line, and Washington Bridge Express Lines, Inc., up to and including February 17, 1939." Pay to the order of Jersey Bus Lines, Inc. Public Service Interstate Transportation Co.
Sometime thereafter in 1939, approximately 21 busses were turned over to petitioner and Messrs. Lipshitz and Brady, each of whom then had a one-third interest therein. The busses had not been sold during the taxable year. The stock sale contract was approved *301 by the Interstate Commerce Commission on December 28, 1938, and by the Board of Public Utility Commissioners of New Jersey on February 1, 1939. The balance of the purchase price was thereafter paid and the stock was thereafter transferred on February 23, 1939. Petitioner, as attorney in fact for the stockholders, received a total purchase price of $468,390.56. In addition to paying various other debts of Jersey Bus therefrom, petitioner paid himself $88,358.37 as full repayment for all monies loaned and advanced by him to Jersey Bus or the other corporations the obligations of which Jersey had assumed. Petitioner did not pay over any of the purchase money to the stockholder members of his family, but retained all of the purchase money allocable to 650 shares with the consent and agreement of the other family member stockholders. It had been agreed by the parties that petitioner would retain the money as a loan from various members of his family. Part of this loan has been repaid by petitioner. No part of the deficiency is due to negligence or intentional disregard of the Commissioner's rules and regulations. Opinion ARUNDELL, Judge: Our first inquiry is whether the rights of *302 the parties to the contract to sell Jersey Bus stock, entered into in 1937, were so fixed by that contract as to make the profits to be received thereunder properly accruable as income in 1937. While ten per cent of the purchase price was paid at the time the contract was entered into, the contract was clearly executory and was not to be and could not be completed until the transaction had been approved by the Interstate Commerce Commission and the Board of Public Utility Commissioners of New Jersey. Prior to the time that the approvals were obtained the Public Service Company did not have an unconditional right to demand the stock of Jersey Bus Lines, nor did the seller have the unconditional right to demand the purchase price. The contingencies were removed only when the last of the necessary approvals were received in 1939. Petitioner's right to receive the purchase money must be unconditional before it may be said that he has realized income from the transaction. Lucas v. North Texas Lumber Co., 281 U.S. 11, 50 S. Ct. 184, 74 L. Ed. 668 (1930); Commissioner v. Segall, 114 F.2d 706; Warren National Bank v. Commissioner, 61 F.2d 325. The stock was transferred and the *303 purchase price was paid only after the approvals had been received. Accordingly, the determination of the Commissioner that the profits were taxable to the petitioner in 1939 is sustained. Nor do we think the record bears out petitioner's contention that the Public Service Company entered into possession and undertook the operations of the Jersey Bus, effective as of June 15, 1937. While there was a contract that points that way, it appears that the only step taken by the Public Service Company was to send an accountant to the office of the Jersey Bus to act as a comptroller and conservator of the assets until the transaction could be completed. This accountant was paid by Jersey Bus. He resigned in 1938, after which it appears that the Public Service Company was not thereafter represented in the affairs of the Jersey Bus until the stock was transferred in 1939. This transaction, in our opinion, lends no support to the petitioner's contention that the sale of the shares should be regarded as having taken place in 1937. The second issue has to do with the amount of the capital gains realized by petitioner upon the sale of his stock in Jersey Bus. Two questions arise under this issue. *304 First, whether a portion of the money received by petitioner was in repayment of sums loaned to Jersey Bus, and, second, the number of shares petitioner personally owned in Jersey Bus and sold to Public Service. We have found that to the extent of $88,358.37, the money received by petitioner on the occasion of the sale of the shares represented repayment of monies loaned by petitioner over a period of years to Jersey Bus or to the corporation whose obligations were assumed by Jersey Bus. This was not only the sum claimed by petitioner, but the sum the other stockholders agreed was due him. We think, therefore, that the profit, as determined by respondent, from the sale of the shares should be reduced by the sum of $88,358.37. Respondent has determined that petitioner was the owner of 650 shares of Jersey Bus stock and that the members of his family, who were the registered owners thereof, were merely his nominees. The stock book of Jersey Bus carries the members of petitioner's family as the owners of the shares and the secretary-treasurer of that corporation testified that these members of petitioner's family were, in fact, the real owners of the shares listed in their name. While *305 it is true that petitioner retained the entire proceeds allocable to 650 shares of Jersey Bus stock on the occasion of its sale, the evidence is uncontroverted that petitioner did so with the consent and approval of the members of his family who were the true owners of the shares, and under an agreement that their shares of the proceeds was to constitute a loan to petitioner to be later repaid. A part of this loan has already been repaid. We conclude that petitioner owned 175 shares of Jersey Bus and is chargeable only on the profit on that number of shares. Respondent on brief remains skeptical of the testimony of petitioner and his witnesses, and claims it lacks corroboration from available records. It is an interesting observation that at least some of the corroborating records were in the court room under subpoena from respondent, but we were not given the benefit of the information. The petitioner alleges that the respondent in his determination has added to his income the sum of $8,333.33 in connection with the so-called bus purchase contract made between petitioner and Public Service. The petitioner takes the position that he should be taxed only with one-third of the value *306 of the busses which were received and that his interest amounted to approximately $500. Petitioner's testimony in connection with this transaction was entirely too casual and is unsatisfactory. He has failed to show wherein the alleged error lies and has failed to give a satisfactory explanation of the transaction. He would have us believe that the whole arrangement was designed simply to turn the busses over to him, Brady, and Lipshitz as a bonus in connection with the sale of the shares to Public Service, and that these busses had a value of not more than $1,500. But, the contract of purchase was made by petitioner as an individual (and not as attorney in fact) with Public Service, although the busses belonged to Jersey Bus. Petitioner offered a $25,000 check signed by him, not as an individual but as attorney in fact, which he says was to pay for the busses, but the indorsement on the check states that it was received in payment for goods and services furnished Jersey Bus, Suburban Bus, and Washington Bridge Express Lines by Public Service. As we have pointed out, the signed contract was between Public Service and petitioner as an individual, and it seems at least a trifle strange *307 that some part of the money received by the stockholders for their shares should be used to carry out this private transaction of petitioner, Brady, and Lipshitz; the two latter were not even stockholders. The proof offered on this issue is unconvincing. The last issue relates to the five per cent negligence penalty determined by the Commissioner under section 293(a) of the Internal Revenue Code. A finding that the return is incorrect, or that the taxpayer did not keep proper or complete records, or that his calculations are confusing is not enough to warrant the imposition of the penalty. Bennett v. Commissioner, 139 F.2d 961. We cannot find on this record that petitioner intentionally disregarded the rules and regulations of the Commissioner and the latter did not expressly so find in his determination of the deficiency penalty. While petitioner's bookkeeping methods would seem to be open to a certain amount of criticism, this falls short of an intentional disregard of the regulations. The Commissioner's determination on this point is disapproved. Decision will be entered under Rule 50.